IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

GERARD JAMES BLACK                                                              PLAINTIFF

v.                                    Civil No.10-2137

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                                  DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Gerard Black, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying his claim for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.   Procedural Background:**

The plaintiff filed his applications for DIB and SSI on June 2, 2008, alleging an amended onset date of January 11, 2008[1], due to bipolar disorder, pulmonary embolism, and cardiomyopathy. Tr. 162, 190. An administrative hearing was held on August 28, 2009. Tr. 24-65. Plaintiff was present and represented by counsel. At this time, plaintiff was 31 years of age and possessed the equivalent of a high school education. Tr. 28. He had past relevant work ("PRW") experience as a telemarketer and food plant worker. Tr. 39-40, 163.

---

[1] Plaintiff initially alleged an onset date of September 15, 2004, but due to a lack of medical evidence to support this date, amended his onset date at the hearing. Tr. 64, 73.

On January 6, 2010, the Administrative Law Judge ("ALJ") concluded that, although severe, plaintiff's impairments did not meet or equal any Appendix 1 listing. Tr. 75. The ALJ determined that plaintiff maintained the residual functional capacity ("RFC") to perform light work that does not involve climbing of ladders, ropes, and scaffolds; sustained driving; work near unprotected heights or dangerous machinery; or, work near excessive heat. From a mental standpoint, he was also limited to non-complex, routine, repetitive work that could be learned by rote with few variables, involving simple instructions, requiring little judgment and only superficial with the public and coworkers incidental to the work performed, and involving concrete, direct, and specific supervision. Tr. 77. With the assistance of a vocational expert, the ALJ then found that plaintiff could perform work as a poultry plant line worker, production line assembler, and sewing machine operator. Tr.60-62, 82.

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on May 12, 2010. Tr. 1-3. Subsequently, plaintiff filed this action. ECF No. 1. This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. ECF No. 7, 8. Plaintiff has also filed a motion for submission of new and material evidence and the Administration has filed a response. ECF. No. 10, .

**II.     Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Id*. "Our review extends beyond examining

the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Id.* As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse the decision simply because substantial evidence exists in the record to support a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). If we find it possible "to draw two inconsistent positions from the evidence, and one of those positions represents the Secretary's findings, we must affirm the decision of the Secretary." *Cox*, 495 F.3d at 617 (internal quotation and alteration omitted).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

    **A.**    <u>**The Evaluation Process**</u>:

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal

an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)-(f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

### III.    Discussion:

Of particular concern to the undersigned is the ALJ's RFC assessment. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009)*; Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

Records indicate that Plaintiff was diagnosed with and treated for cardiomyopathy and a pulmonary embolism. On March 10, 2008, Plaintiff presented in Dr. R. Peter Fleck's office for an evaluation for complaints of chest pain. Tr. 376-378. The pain reportedly radiated from the left side of his chest into his axilla and down his left arm and was sometimes associated with a clinched jaw. Mild nausea, heart palpitations, night sweats, and blurred vision were also reported. Plaintiff indicated that these spells were not brought on by exertion nor by emotional stress or anxiety. A physical examination revealed no abnormalities. An EKG demonstrated sinus rhythm, an incomplete right bundle branch block, and a leftward axis. Lab studies revealed normal electrolytes and cardiac enzymes. The event recorder revealed only sinus rhythm at a normal rate. Tr. 382-384. Dr. Fleck indicated that Plaintiff's EKG was consistent with a left anterior fascicular block and an incomplete right bundle branch block which was sometimes seen in cases of atrial septal defect or large patent foramen ovale. He recommended an echocardiogram combined with a stress test to assess his exercise tolerance, oxygen saturation during stress, and the structural integrity of his heart, as well as to rule out ischemic heart disease. If the event recorder showed no rhythm disturbances and the stress study was normal, Dr. Fleck stated he would not recommend further cardiac evaluation. However, he suggested Plaintiff stop smoking, get regular exercise, and consider alternative etiologies for his chest discomfort. A stress study was scheduled for the following Thursday. Tr. 376-378.

On March 20, 2008, Dr. Fleck noted that Plaintiff had undergone a stress echocardiogram study in which he walked through two minutes of Stage III of a Bruce protocol before the study was stopped for exceeding target heart rate. Tr. 375, 808-811, 788. He had no problems with chest pain or new electrocardiographic changes. Tr. 379-381. His resting EKG showed an

incomplete right bundle branch block and left axis deviation consistent with left anterior fascicular block. Further, his resting echocardiogram showed an ejection fraction of only 47%. There was the suggestion of a little sluggishness in the lateral wall, but nothing definite. The stress echo showed the ejection fraction increase to only 51%. There was no real significant deterioration in the left ventricular function and no specific wall motion abnormalities, other than a tendency for some sluggishness of the lateral wall. There was no evidence for intracardiac shunt. Although this study was not significantly abnormal, Dr. Fleck did not believe it could be characterized as conclusively normal either. For the time being, he recommended Plaintiff continue to carry the event recorder for his palpitations, completely stop smoking, and get regular exercise in the form of brisk walks or an equivalent aerobic activity. If Plaintiff were to begin experiencing exertional chest pain or pressure, he was directed to contact Dr. Fleck. Otherwise, Plaintiff was directed to return in four months to obtain another echocardiogram, which Dr. Fleck felt would show any underlying cardiomyopathic process. Tr. 375.

On March 21, 2008, Plaintiff presented in the ER with complaints of chest pain and some numbness in his left arm. Tr. 390-402, 636-637. Plaintiff's physical examination was normal, and a full cardiac work-up was unremarkable. An EKG revealed only sinus rhythm, left axis deviation, and nonspecific T wave flattening. Tr. 804-805. Further, chest x-rays showed hyperinflation of the lungs, but were otherwise normal. Tr. 648. The ER doctor conferred with Dr. Fleck, who was not concerned about Plaintiff having cardiac chest pain and stated that it would be safe to discharge him. Plaintiff was released home with a prescription for Vicodin. The doctor also recommended that he take Pepcid or Prilosec to see if this might also help to alleviate his symptoms. Tr. 390-402.

On May 13, 2008, Plaintiff sought emergency treatment for chest pain that radiated into his left arm and neck. Tr. 434-450. A chest x-ray revealed no acute disease process. An EKG showed a normal sinus rhythm with no ST-T changes and normal PR and QS intervals. Accordingly, Plaintiff was diagnosed with chest pain of unknown etiology and prescribed Darvocet. Tr. 434-450.

On May 23, 2008, Plaintiff returned to the ER with complaints of continued right sided chest pain. Tr. 451-483. A CT angiogram was significant for a right sub segmental pulmonary embolism, and Plaintiff was referred to hospitalist services for inpatient admission and management. He was admitted and placed on Lovenox and loaded with Coumadin. Lorcet was used for pain control and Prilosec was administered to treat his GERD. Chantix was also prescribed to help him stop smoking. On May 29, 2008, Plaintiff stated that he wished to be discharged following the administration of his medication, stating that he had made arrangements to follow up with his primary care physician the following morning. As such, he was dosed and discharged home in stable condition. Tr. 451-483.

On July 16, 2008, Plaintiff followed-up with Dr. Fleck. Tr. 541-542, 785-786. He reported continued episodes of chest discomfort, which he described as sharp and stabbing. Dr. Fleck noted that Plaintiff's EKG had previously shown a left anterior fascicular block. As such, he believed it a good idea to follow-up with an echocardiogram to assess both left ventricular function and to look for evidence of occult pulmonary hypertension. It was possible that Plaintiff's chest pain was caused by recurrent small pulmonary emboli and possibly a hypocoagulable state. Tr. 541-542.

AO72A
(Rev. 8/82)

An echocardiogram conducted on July 25, 2008, revealed diminished left ventricular systolic performance with normal diastolic function and no evidence for valvular abnormalities. Tr. 802-803.

On August 5, 2008, Dr. Fleck noted that a recent echocardiogram had revealed a ejection fraction rate of 39% with no evidence of valvular abnormalities. Tr. 885, 783. He opined that this was difficult to explain in a patient of Plaintiff's young age, especially in light of his negative stress study. Dr. Fleck felt this warranted an arteriogram to more carefully investigate the potential etiologies of Plaintiff's left ventricular dysfunction, as well as to confirm the LV dysfunction and measure intracardiac pressures. Tr. 885.

On August 10, 2008, Plaintiff returned to the emergency room with complaints of chest pain and dental pain. Tr. 546-564. The onset of chest pain was with exertion. A chest x-ray revealed no acute cardiopulmonary disease. Plaintiff was prescribed Lorcet Plus and Erythromycin. Tr. 546-564.

On August 14, 2008, Plaintiff underwent a heart catheterization procedure. Tr. 638-639, 886-887, 800-801. It revealed cardiomyopathy of unknown etiology with normal filling pressures and good cardiac output. His ejection fraction rate was measured at 45% with a post PVC beat ejection fraction rate of 68%. Plaintiff was advised to avoid nicotine exposure, and due to his remote history of methamphetamine abuse, it was noted that he would be screened for re-exposure to any stimulant drugs. Tr. 638-639.

On September 2, 2008, Plaintiff was again treated for chest pain. Tr. 565-586. He reported a cardiac catheterization with Dr. Fleck in August that revealed cardiomyopathy. However, his EKG and triage panels were normal at this time. His D- Dimer level was slightly

elevated, but the doctor noted that Plaintiff showed no clinical signs of a pulmonary embolism. Plaintiff was prescribed Lorcet Plus. Tr. 565-586.

On September 11, 2008, Plaintiff continued to experience chest pain, in spite of taking the Coumadin as prescribed. Tr. 524-526, 698-700. It was noted that Plaintiff had been taking the same dosage of Coumadin since his heart catheterization. As such, Plaintiff's dosage was increased, and he was advised to return in one week for repeat monitoring. Tr. 524-526.

On September 15, 2008, Plaintiff returned to the ER with further complaints of episodic chest pain. Tr. 602-619, 762-767, 742-759. Plaintiff was diagnosed with pleurisy and chest wall pain. Tr. 602-619.

On October 24, 2008, Plaintiff's blood pressure was 138/74. Tr. 780. Dr. Fleck felt that he could tolerate a low dose ACE inhibitor and also prescribed Digoxin. He advised Plaintiff to refrain from smoking, drinking, and using recreational drugs. Dr. Fleck also indicated that the cardiomyopathy caused by Plaintiff's prior drug use could be irreversible and could be the reason for his problems today. Tr. 780.

On November 10, 2008, Plaintiff was again treated for chest pain with nausea and shortness of breath. Tr. 841-848. An EKG revealed no changes from previous results. Tr. 799. He was diagnosed with cardiomyopathy and administered Nitroglycerine, Morphine, Zofran, and Lortab. Tr. 841-848.

On May 31, 2009, Plaintiff complained of exhaustion, trouble breathing, neck and shoulder cramps, pain in the chest, a lump in his throat, and muscle tension. Tr. 815-827. A chest x-ray was withing normal limits. However, an EKG revealed left axis deviation,

incomplete right bundle branch block, and nonspecific T wave flattening. Tr. 798. This was interpreted as a borderline EKG. Tr. 798.

On July 2, 2009, Plaintiff complained of palpitations and chest pain. Tr. 930-955, 910-929. An EKG revealed atrial fibrillation with a rapid ventricular response. He underwent an adenosine stress/rest test with tetrofosmin myocardial perfusion imaging showing no myocardial perfusion defects. However, his ejection fraction was 49% with mild global hypokinesis. He was diagnosed with atrial fibrillation and chest pain. His atrial fibrillation responded well to Digoxin, however, his INR level remained subtherapeutic. Plaintiff was released home on July 5, 2009, with plans to follow-up with Good Samaritan Clinic and Dr. Fleck. Tr. 930-955, 910-929.

In spite of this evidence, we note that the record contains only one physical RFC assessment, dated July 22, 2008. Tr. 486-493. It was prepared by a non-examining, consultative doctor who had only the benefit of viewing Plaintiff's medical records dated until July 22, 2008, and concluded that Plaintiff was capable of performing medium level work. *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (holding that the opinion of a consulting physician who examined the plaintiff once or not at all does not generally constitute substantial evidence). However, we note that repeat testing has revealed that Plaintiff has an ejection fraction rate of 40-49%. Although this ejection fraction rate is not low enough to meet the regulations threshold, we do believe it is evidence of an ongoing impairment that would result in limitations. And, given Plaintiff's age and medical history, it is not unreasonable to conclude that Plaintiff's heart condition would limit his ability to perform a full range of medium work. However, without the benefit of an RFC assessment from Plaintiff's treating cardiologist or even the doctor at the Good

Samaritan Clinic that performed his medication adjustments, it is not clear the exact level of work Plaintiff could perform. And, we note that the RFC assessment assigned by the ALJ must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Lewis*, 353 F.3d at 646. Accordingly, we believe remand is necessary to allow the ALJ to reevaluate the medical evidence and obtain RFC assessments from Plaintiff's treating doctors. *Chitwood v. Bowen*, 788 F.2d 1376, 1378 n.1 (8th Cir. 1986); *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985). If RFC assessments can not be obtained, then Plaintiff should be referred to a cardiologist for a consultative examination and an RFC requested from the examiner at the conclusion of the evaluation. *See Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (holding ALJ required to order medical examinations and tests if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled). Medical records showing the results of Plaintiff's previous EKG's, echocardiograms, stress tests, catheterizations, and arteriograms should also be forwarded to the examiner for his review.

## IV.     Conclusion:

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this 9th day of June 2011.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)